IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:08-CR-81-D-1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| KIMBERLY WHITE, | ) | |
| | ) | |
| Defendant. | ) | |

On May 21, 2009, this court held a hearing pursuant to Sell v. United States, 539 U.S. 166 (2003), to determine whether the government may forcibly medicate Kimberly White ("White" or "defendant") for the purpose of restoring her competency [D.E. 30]. On May 29, 2009, the government and defendant submitted written arguments in support of their respective positions [D.E. 31, 32]. On June 5, 2009, defendant responded [D.E. 33]. As explained below, the court permits the government to medicate White forcibly for the purpose of restoring her competency for trial.

I.

On March 19, 2008, a grand jury in this district returned an indictment against White [D.E. 3]. The indictment charges White with the following offenses: one count of conspiracy to commit credit card fraud in violation of 18 U.S.C. § 371, three counts of credit card fraud and aiding and abetting in violation of 18 U.S.C. §§ 1029(a)(2) and 2, and two counts of aggravated identity theft in violation of 18 U.S.C. § 1028A. Id. at 1–4. On April 7, 2008, Magistrate Judge James E. Gates held a detention hearing and ordered White to be detained [D.E. 10]. On April 21, 2008, this court ordered a psychiatric examination to evaluate White's competency to stand trial [D.E. 14].

On July 22, 2008, the court held a hearing pursuant to 18 U.S.C. § 4241 to determine White's competency to stand trial [D.E. 19]. As stated in open court and incorporated into a written order [D.E. 18], the court found by a preponderance of the evidence that White was suffering from a mental disease or defect rendering her mentally incompetent to the extent that she is unable to understand the nature and consequences of the proceedings against her or to assist properly in her defense. See 18 U.S.C. § 4241(d). The court ordered White committed to the custody and care of the Attorney General for treatment in a suitable facility to determine whether there is a substantial probability that in the foreseeable future she will attain the capacity to permit the proceedings to go forward. See id. § 4241(d)(1).

The government placed White in the custody of the Federal Medical Center in Carswell, Texas ("FMC-Carswell"). The court received a letter dated December 5, 2008, from FMC-Carswell Warden W. Elaine Chapman. The letter attached a forensic evaluation of White and noted that FMC-Carswell's clinical staff considered White a suitable candidate for forced medication to render her competent to stand trial pursuant to Sell.

On December 9, 2008, the court entered an order directing the parties to respond to Warden Chapman's letter [D.E. 20]. On January 5, 2009, the court granted the government's unopposed motion to schedule a Sell hearing [D.E. 24]. On May 6, 2009, the court granted defendant's motion to permit defendant and her counsel to attend the Sell hearing via video conference [D.E. 27]. On May 15, 2009, in anticipation of the hearing, the government filed a memorandum in support of its interest under Sell [D.E. 29].

On May 21, 2009, the court held a Sell hearing to determine whether the government may forcibly medicate White for the purpose of restoring her competency [D.E. 30]. At the hearing, Dr. Leslie Powers ("Powers") and Dr. Camille Kempke ("Kempke") testified on behalf of the

2

government. The government witnesses and defense counsel were at FMC-Carswell and attended the hearing via video conference. Defense counsel invited White to attend the hearing, but White elected to remain in her cell.[1]

At the hearing, Powers testified first. Powers is a forensic psychologist licensed to practice in the State of Texas since 2005. Sell Hearing Tr. 6. The court recognized her as an expert in the field of clinical and forensic psychology. Id. at 9. Powers diagnosed White with delusional disorder-grandiose type. Id. at 9–13. Specifically, White believes that she has discovered the cures for AIDS and breast cancer, she hoards food in order to manufacture these cures, she refuses to bathe (so as not to allow someone to steal her cures), and she writes notes on her cell regarding her delusional process. See id. at 11, 23. Despite this behavior, she has never been physically aggressive and she has never attempted to harm herself. See id. at 12. Thus, Powers concluded that White is not a danger to herself or others without medication, that White's health would not be greatly at risk without the medication, and that White did not present any grounds for civil commitment. Id. at 14–18, 25–26. According to Powers, "outside of the delusion, you often see someone [with delusional disorder] who is very rational, capable of living a normal life. But once the delusions come up or the topic comes up about their delusional content, then you start seeing reactional kind of thinking." Id. at 22. White's delusional disorder prevents her from communicating with counsel or anyone else about the criminal proceedings against her. See id. at 13–14. Powers also noted that she and her staff have exhausted nonmedicinal treatments to White's disorder, and White has refused to take medication voluntarily. See id. at 15.

---

[1] In view of White's election not to attend the hearing, the court finds that White waived her right to attend the hearing. See Sell Hearing Tr. 3–5; cf. Fed. R. Crim. P. 43.

3

Next, Dr. Kempke testified. Id. at 27–71. Kempke is a psychiatrist licensed to practice in the State of Texas since 2005, and the State of Michigan since 1980. Id. at 27. The court recognized her as an expert in the field of psychiatry. Id. at 30. Kempke was present during Power's testimony and agreed with Powers' diagnosis of White and Powers' assessment that White was not a danger to herself or others, that White's health was not gravely at risk, and that there were no other grounds for civil commitment. Id. at 30; see Govt.'s Ex. 51. Kempke recommends treating White with antipsychotic medications. Sell Hearing Tr. 31; Govt.'s Ex. 51. She testified as to the two categories of antipsychotic medications: first-generation (or typical) and second-generation (or atypical). Sell Hearing Tr. 31.

White's refusal to take medication voluntarily limits the treatment options available. See id. at 36–37. Thus, Kempke notes three antipsychotic drugs available in an injectable form that she could use to forcibly medicate White: two first-generation medications (Haldol Decanoate and Prolixin Decanoate or Enanthate) and one second-generation medication (Risperdal Consta). Id. at 37. Due to concerns with an allergic reaction, any drug would have to be introduced with a small dosage. See id. at 37–38. Risperdal Consta is Kempke's preferred medication. See id. at 31; cf. Govt.'s Ex. 51. However, Risperdal Consta is not available in a short-acting injectable form. Sell Hearing Tr. 38. Thus, Kempke's treatment protocol would be to request White to take a Risperdal Consta tablet. Id.; see id. at 54–55. If White took the Risperdal Consta tablet and did not show any allergic reaction, then White would receive a 25-mg injection of Risperdal Consta every two weeks. Id. at 56. If White refused the Risperdal Consta tablet, then Kempke would administer a 10-mg test dose of Haldol Decanoate. Id. at 41; see id. at 54–55. Assuming no allergic reaction, White would receive 50-mg doses of Haldol Decanoate every two to four weeks, up to a maximum dosage of 100 mg every four weeks. Id. at 37, 52.

4

Kempke also explained the process she would use to forcibly medicate White. First, several FMC-Carswell staff members, using a process of confrontation-avoidance, would ask White to take the medication voluntarily. Id. at 63. If White refused, Kempke would seek the warden's approval to assemble a use-of-force team. Id. at 63–64. If approved, the captain and lieutenants of the correctional staff then would assemble a group of five volunteers from the correctional staff along with a medical technician, a nurse, and a physician assistant from the medical staff. Id. at 64. The team would suit up in protective gear. Id. at 64–65. The team would give White an additional opportunity to cooperate. Id. at 66. If White declines, the correctional staff portion of the use-of-force team would enter White's cell and immobilize and restrain White. Id. Once White is restrained, the medical staff members would enter White's cell, perform the necessary injections and blood draws for laboratory screenings, evaluate White, and further treat White (as necessary). Id. at 67. The process would be repeated for every injection, always allowing White an opportunity to take the medication voluntarily. Id. at 68.

Kempke also testified as to the side effects of the antipsychotic drugs. The side effects for first-generation antipsychotic drugs include: short- and long-term tardive dyskinesia, which has an accumulative rate of 5 percent per year, reaching 60 percent of individuals over a 20-year span (id. at 31–32);[2] extrapyramidal symptoms, which include shuffling gait, muscle twitches, and muscle spasms, and which can be treated by anticholinergic drugs (id. at 32); neuroleptic malignant syndrome, which may involve the loss of control of the body's ability to maintain thermal homeostasis (id.); instability in movement (id.); and agranulocytosis, which is reduction in the white

---

[2]In a letter accompanying her testimony, Kempke defined tardive dyskinesia as "a movement disorder that is characterized by abnormal, repetitive, sometimes writhing or twitching movements of muscles of the tongue and mouth (sometimes referred to as 'rabbit mouth' symptoms) but other muscles of the body may be involved." Govt.'s Ex. 51.

blood cell count and which can be fatal (Govt.'s Ex. 51). For second-generation antipsychotic drugs, the side effects include: lower risk (relative to first-generation drugs) of tardive dyskinesia and extrapyramidal symptoms (Sell Hearing Tr. 34); and metabolic syndrome, which includes elevated body weight and increased risk of diabetes and hyperlipidemia (id. at 34–35). In a letter accompanying her testimony, Kempke also noted the following less serious possible side effects for both types of antipsychotic drugs: "muscle stiffness, agitation, sedation, low blood pressure, weight gain, dry mouth, lowering of seizure threshold, and elevated prolactin, which could cause enlarged breasts or inappropriate lactation." Govt.'s Ex. 51.

Kempke considers most of these side effects to be rare. Id. "When they do occur, they can be effectively dealt with by treatment strategies or by changing the medication." Id. Kempke would monitor White for side effects. Sell Hearing Tr. 39. If White showed signs of extrapyramidal symptoms or tardive dyskinesia, she would be treated with anticholinergic drugs, and Kempke would consider changing her antipsychotic drug type or dosage. See id. at 32–33, 40, 53–54. If White took the Risperdal Consta, Kempke would perform baseline screenings for diabetes, liver and kidney problems, and cholesterol changes and repeat these screenings every three months. Id. at 39; see id. at 70. White would be monitored daily for any other serious symptoms. Id. at 39. Kempke testified that all three drugs are relatively safe and have been used to treat millions of people with schizophrenia, delusional disorder, and other psychotic disorders. Id. at 39; see Govt.'s Ex. 51.[3]

---

[3]Kempke acknowledged that because of delusional disorder's lower incident rate, the effectiveness of antipsychotic drugs for delusional disorder is not as well-studied as that of other psychotic disorders, such as schizophrenia. Sell Hearing Tr. 39, 46–47, 50–51. To the extent that there is any difference in risk profile between antipsychotic drugs for treatment of delusional disorder and antipsychotic drugs for treatment of schizophrenia, Kempke testified that individuals with delusional disorder were at a lower risk of side effects. Id. at 47. Powers also acknowledged the

6

Based on Kempke's medical opinion and her knowledge of White's particular mental and physical condition, Kempke testified that the medication would be substantially likely to render White competent to stand trial. Id. at 41. Kempke stated that she expects that the treatment would render White competent within two weeks for the first-generation drugs or within four weeks for the second-generation drugs, but Kempke acknowledged that it might take as much as five months to restore White's competency. Id. at 57, 59. Kempke also testified that any side effects of the medication would not interfere significantly with White's ability to assist counsel in conducting her defense. Id. at 42; see Govt.'s Ex. 51. Kempke agreed with Powers that no less intrusive treatment options are available. Sell Hearing Tr. 42; see Govt.'s Ex. 51.

On May 29, 2009, the government and defendant submitted written arguments in support of their respective positions [D.E. 31, 32]. On June 5, 2009, defendant responded [D.E. 33].

II.

Under the Fifth Amendment's Due Process Clause, White has "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs." Washington v. Harper, 494 U.S. 210, 221 (1990). This liberty interest, however, is not unlimited. In Harper, the Supreme Court held that "the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." Id. at 227. In Sell, the Court recognized another ground justifying forcible medication:

> [T]he Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render

---

limited set of studies on treatment of individuals with delusional disorders. Id. at 19. Powers noted that, of the three studies available, all showed at least 75 percent of the subjects partially improved with antipsychotic medication. See id. at 19–20.

7

that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests.

Sell, 539 U.S. at 179; see United States v. Evans, 404 F.3d 227, 235 (4th Cir. 2005).

The Court in Sell recognized that forced medication may be warranted for different purposes. See Sell, 539 U.S. at 181–82; see also Harper, 494 U.S. at 225–27; United States v. Holman, 532 F.3d 284, 289 (4th Cir. 2008). If the court determines any one of these alternate grounds justifies forced medication, "the need to consider authorization on trial competence grounds will likely disappear." Sell, 539 U.S. at 183. Thus, when the court is asked to approve forced administration of drugs under Sell, the court should first determine whether the government seeks, or has sought, permission to forcibly medicate the defendant under "Harper-type grounds," and if not, why not. Sell, 539 U.S. at 183.

Here, both Powers and Kempke agree that White is not gravely ill and is not a danger to herself or others. See Sell Hearing Tr. 14–15, 16, 25–26; Govt.'s Ex. 51. White also is not a candidate for civil commitment. See Sell Hearing Tr. 14–15, 16, 25–26. Thus, White is not a candidate for forcible medication under Harper, and Sell controls.

To forcibly medicate a defendant under Sell, the government must prove by clear and convincing evidence: (1) that "important governmental interests are at stake"; (2) "involuntary medication will significantly further those concomitant state interests"; (3) "involuntary medication is necessary to further those interests"; and (4) "administration of the drugs is medically appropriate." Sell, 539 U.S. at 180–81 (emphasis omitted).

Under the first prong, "[a]n important governmental interest exists when the defendant is accused of a serious crime and special circumstances do not undermine the government's interest

8

in trying him for that crime." Evans, 404 F.3d at 235 (quotations omitted). In determining if a crime is serious, the court should focus "on the maximum penalty authorized by statute." Id. at 237. The court must also consider whether any special circumstances undermine the government's interest in prosecuting defendant. See Sell, 539 U.S. at 180; Evans, 404 F.3d at 235. For example, "[t]he defendant's failure to take drugs voluntarily . . . may mean lengthy confinement in an institution for the mentally ill — and that would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." Sell, 539 U.S. at 180. The court may also consider if defendant has already been in custody for such a significant period (for which she would receive credit if she were ultimately convicted and sentenced) that forcibly medicating her would be fruitless in terms of increasing her punishment. See id.; Evans, 404 F.3d at 239.

Here, White has been charged with one count of conspiracy to commit credit card fraud, three counts of credit card fraud and aiding and abetting, and two counts of aggravated identity theft. Indictment 1–4. The statutory maximum penalty for conspiracy to commit credit card fraud is five years' imprisonment. 18 U.S.C. § 371. The statutory maximum penalty for credit card fraud and aiding and abetting is ten years' imprisonment. 18 U.S.C. §§ 2, 1029(a)(2). The statutory penalty for aggravated identity theft is two years' imprisonment consecutive to any other term imposed. 18 U.S.C. § 1028A. If White were convicted of all of the charges in her indictment, White's minimum statutory penalty would be four years' imprisonment, and her maximum statutory penalty would be 39 years' imprisonment. Accordingly, the court finds that defendant is accused of "serious crimes" and the government has an important interest in prosecuting White for these crimes.

As for whether any special circumstances undermine the government's interest, White has been in custody for approximately eighteen months. The parties agree that she would not be an appropriate candidate for civil commitment. Thus, if White is not rendered competent to stand trial,

9

she likely would be released, and the government would surrender its opportunity to prosecute her. Accordingly, no special circumstances undermine the government's interest, and the court finds that the government meets the first prong under Sell.

Next, the court considers whether involuntary medication will significantly further concomitant state interests. See Sell, 539 U.S. at 181. To satisfy this prong, the court must find that (1) "administration of the drugs is substantially likely to render the defendant competent to stand trial;" and (2) "administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." Id.

In this case, Kempke testified that the treatment recommended would be substantially likely to render White competent to stand trial. Sell Hearing Tr. 41. The antipsychotic drugs that Kempke recommends enjoy a high success rate for psychotic disorders generally and delusional disorder specifically. See id. at 19–20. As for the side effects, Kempke considers most of them to be rare and treatable. See Govt.'s Ex. 51. Moreover, any side effects would not interfere significantly with White's ability to assist counsel in conducting her defense. Sell Hearing Tr. 42; Govt.'s Ex. 51. Therefore, the court finds that the government meets the second prong under Sell.

To meet the third prong under Sell, "[t]he court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results." Sell, 539 U.S. at 181. Powers testified that White's condition is unlikely to improve without treatment with antipsychotic medication because White will not acknowledge she has a severe mental disorder and therefore is unlikely to engage in any form of psychotherapy. See Sell Hearing Tr. 15. Kempke agrees with Powers that no less intrusive treatment options are available. Id. at 42. Therefore, the court finds that no alternative, less intrusive treatments would achieve the same result as the treatment regiment

10

recommended by the government.

The fourth prong under Sell is that the administration of the recommended drugs is "medically appropriate." In evaluating this factor, the court takes into account that "[d]ifferent kinds of antipsychotic drugs may produce different side effects and enjoy different levels of success." Sell, 539 U.S. at 181. As mentioned, antipsychotic drugs have been successful in the treatment of millions with psychotic disorders. Kempke, a licensed psychiatrist, stated that the treatment protocol is the most appropriate way to address White's condition. Further, the recommended protocol is consistent with treatment options for delusional disorder. Moreover, Kempke testified that the serious side effects were rare and could be managed. Accordingly, the court finds that the government has satisfied the fourth prong under Sell.

In analyzing the government's motion, the court credits the testimony of Kempke and Powers. Because the government has met its burden of proof under Sell, the government may forcibly medicate White.

III.

For the reasons stated above, the government's request that White be forcibly medicated in order to render her competent for arraignment and trial is GRANTED, subject to the following conditions: (1) FCI-Carswell staff shall provide White with a copy of this order; (2) FCI-Carswell medical staff shall medicate in a manner consistent with the medication plan outlined on pages 36–68 of the May 21, 2009 hearing transcript; (3) all medical personnel treating White first shall request that she voluntarily take medication before each forced administration of medication; and (4), if White declines to voluntarily take medication within ten days of this order for the first administration and within medically reasonable times to achieve the goal of the medical plans for all subsequent administrations, FCI-Carswell staff members are authorized to administer the

11

medication by injection and with necessary force. The court continues White's commitment pursuant to 18 U.S.C. § 4241(d)(1) for a period of four months, or a lesser period if reasonably sufficient to restore her to competency. At the end of four months, or whenever White's competency is restored, if sooner, the government shall file a report with the court detailing the results of treatment. If the government concludes that White's trial competency has been restored, the report should state what side effects, if any, White has experienced on the medication, and how these side effects would affect White in the preparation of her defense and during any court proceedings she attends. The Clerk of Court is DIRECTED to send a copy of this order to the Warden at FCI-Carswell electronically and via regular mail.

In defendant's response to the government's memorandum in support of forcible medication, defendant asks the court to stay any order that permits the government to forcibly medicate White. An order permitting the forcible medication of a defendant is immediately appealable. See Sell, 539 U.S. at 177; Evans, 404 F.3d at 235. Accordingly, this order is STAYED pending resolution of White's anticipated appeal. Permitting the appeal to go forward does not strip this court of its jurisdiction over White's case. See, e.g., Ex Parte Nat'l Enameling & Stamping Co., 201 U.S. 156, 162 (1906); Columbus-Am. Discovery Group v. Atl. Mut. Ins. Co., 203 F.3d 291, 301–02 (4th Cir. 2000).

SO ORDERED. This 9 day of October 2009.

JAMES C. DEVER III
United States District Judge